**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:11-cv-00090-MR-DLH**

| | | |
|---|---|---|
| **JOHN MESSER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MEMORANDUM OF** |
| **vs.** | ) | **DECISION AND ORDER** |
| | ) | |
| | ) | |
| **THE PRUDENTIAL INSURANCE** | ) | |
| **COMPANY OF AMERICA and** | ) | |
| **THERMO FISHER SCIENTIFIC, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the parties' cross-motions for summary judgment [Docs. 19, 23].

## I.      PROCEDURAL BACKGROUND

The Plaintiff John Messer brings this action against the Defendants The Prudential Insurance Company of America ("Prudential") and Thermo Fisher Scientific, Inc. ("Thermo Fisher") (collectively, "Defendants") pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA"). [Doc. 1]. In his Complaint, the Plaintiff alleges that at all relevant times he was employed by Thermo Fisher and was a

participant in Thermo Fisher's short term disability ("STD") and long-term disability ("LTD") plans, both of which were administered by Prudential. [Id.].  The Plaintiff further alleges that the Defendants failed to pay all disability benefits owing to him under the terms of the STD and LTD plans. [Id.].

The parties now move for summary judgment on the basis of the administrative record.  [Docs. 19, 23].[1]  For the reasons that follow, the Defendants' motion for summary judgment will be granted, and the Plaintiff's motion for summary judgment will be denied.

## II.    FACTUAL BACKGROUND

### A.    The Plans

Thermo Fisher offered its eligible employees short-term disability benefits through its STD Plan.  [Doc. 15-4 at 83-107].  The STD Plan is administered by Prudential pursuant to an administrative services agreement between Prudential and Thermo Fisher.  [Doc. 15-4 at 68-82].  Although the STD Plan is administered by Prudential, Thermo Fisher funds any benefits payable under the STD Plan.  [Doc. 15-4 at 87].

---

[1] The Plaintiff's Motion for Summary Judgment, as originally filed, did not comply with the font requirements set forth in the Court's Case Management Order.  The Plaintiff subsequently filed a corrected brief [Doc. 21].  Accordingly, all further citations to Plaintiff's arguments will be to the corrected brief.

2

Under the terms of the STD Plan, a participant is entitled to STD benefits when he or she: (1) is unable to perform the material and substantial duties of his or her own occupation due to sickness or injury; (2) is under the regular care of a doctor; and (3) has a 20% or more loss in weekly earnings due to the sickness or injury. [Doc. 15-4 at 89]. The STD Plan provides that STD payments will no longer be provided and a participant's claim will terminate on the earliest of several dates, including the date on which a participant "fail[s] to submit satisfactory proof of continuing disability." [Doc. 15-4 at 95].

Thermo Fisher also offered its eligible employees long-term disability benefits through the LTD Plan, which was administered and funded by Prudential under group contract number G-50124-MA ("Group Contract"). [Doc. 15-4 at 20-67]. Under the terms of the LTD Plan, a participant is entitled to LTD benefits when Prudential determines that he or she: (1) is unable to perform the material and substantial duties of his/her own occupation due to sickness or injury; (2) is under the regular care of a doctor; and (3) has a 20% or more loss in weekly earnings due to the sickness or injury. [Doc. 15-4 at 33]. After 12 months of payments, a participant remains entitled to benefits only when Prudential determines that due to the same sickness or injury the participant is: (1) unable to

3

perform the duties of any gainful occupation for which he or she is reasonably fitted by education, training or experience; and (2) under the regular care of a doctor. [Id.].

The LTD Plan includes a limited pay period for "[d]isabilities which, as determined by Prudential, are due in whole or part to mental illness." [Doc. 15-4 at 42]. The LTD Plan also limits benefits for "[d]isabilities due to a sickness or injury which, as determined by Prudential, are primarily based on self-reported symptoms." [Id.]. Accordingly, a participant is entitled to no more than 24 months of payments in his or her lifetime for self-reported symptoms and/or mental illness. [Doc. 15-4 at 43].

The LTD Plan states that LTD benefits begin when Prudential determines the criteria have been satisfied and will stop on the date the participant is no longer disabled under the terms of the LTD Plan or fails to submit proof of continuing disability "satisfactory to Prudential." [Doc. 15-4 at 31, 42].

The Summary Plan Description ("SPD") for the LTD Plan states that Prudential "has the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits." [Doc. 15-4 at 63]. The SPD further provides that a decision by Prudential will only be overturned if it is arbitrary and capricious. [Id.].

4

## B. Claim History

The Plaintiff first left work on March 10, 2010, purportedly due to major depressive disorder described as recurrent with a seasonal component (especially in winter).[2]  [Doc. 15-3 at 6].  At the end of his available FMLA leave, on March 24, 2010, the Plaintiff applied for STD benefits, and benefits were approved through August 15, 2010.  [Doc. 15-3 at 92].  By a letter dated September 21, 2010, the Plaintiff was informed that his STD benefits were terminated effective August 16, 2010, and his claim for LTD benefits was denied.  [Doc. 15-3 at 78-81].

The Plaintiff appealed the termination of his STD claim and the denial of his LTD claim.  On November 22, 2010, Prudential upheld its prior denial on the grounds that the medical evidence on file did not demonstrate functional impairment or psychological or cognitive impairment that would preclude the Plaintiff from performing his regular occupation.  [Doc. 15-3 at 64-70].  The Plaintiff submitted another appeal, which was subsequently denied by Prudential on January 19, 2011.  In denying this second appeal, Prudential noted that while the Plaintiff had received treatment for

---

[2] While the Plaintiff claims that he "left work during the winter of 2009-2010 under the Family Medical Leave Act" [Doc. 21 at 6], the earliest date identified in the administrative record indicating the Plaintiff's absence from work is March 10, 2010.

depression, the documentation submitted by the Plaintiff and his doctors did not support an inability to function. [Doc. 15-3 at 53-57].

### C. Plaintiff's Medical History

The Plaintiff was employed as a repair technician with Thermo Fisher for approximately 25 years. [Doc. 15-3 at 36]. As a repair technician, the Plaintiff's primary responsibility was to provide electrical, general construction, and refrigeration repairs on units during the manufacturing process. [Doc. 15-1 at 35].

The Plaintiff's reported diagnoses are major depressive disorder, recurrent with seasonal component, obsessive compulsive disorder ("OCD") and obsessive compulsive personality disorder ("OCPD"). [Doc. 15-1 at 50].

The record reflects that the Plaintiff has seen counselor Judy McClung, MA, LMFT, since April 28, 2010. Ms. McClung reported that the Plaintiff suffers from anxiety, insomnia, a fear of failure, a tendency to be a perfectionist, depressed mood and a subjective sense of confusion. [Doc. 15-1 at 51]. Additionally, a December 12, 2009 note from psychiatrist Marianna Daly, M.D., indicates that Plaintiff has a long history of significant depression, has had trouble at work and experiences seasonal changes in his depression with a worsening in the winter months. [Doc. 15-1 at 52].

6

On July 2, 2010, the Plaintiff underwent an initial evaluation with a psychiatrist, Mary Berg, M.D. [Doc. 15-1 at 41-44]. The Plaintiff denied experiencing any hallucinations or delusions and denied having any suicidal or homicidal thoughts. [Doc. 15-1 at 41]. Dr. Berg described Plaintiff's thought processes as logical and coherent and his mood as depressed and anxious. [Doc. 15-1 at 43]. Dr. Berg further noted Plaintiff's judgment and memory to be intact and his insight regarding the presence of his disorder was described as "good." [Id.]. While Dr. Berg noted that Plaintiff's attention was impaired, Dr. Berg did not conduct a mini-mental status examination to determine the extent of Plaintiff's cognitive impairment. [Id.]. Finally, Dr. Berg noted that Plaintiff was "burned out" and wanted to look for other jobs, e.g., plumbing. [Doc. 15-1 at 41].

During a subsequent visit to Dr. Berg in August 2010, Plaintiff reported continued depression and anxiety and being easily overwhelmed. [Doc. 15-1 at 38]. Plaintiff also reported to Dr. Berg that he did not intend to return to Thermo Fisher and instead planned to start his own plumbing business. [Id.]. In a visit in September 2010, Dr. Berg noted minimal progress on the improvement of his depressive symptoms. [Doc. 15-1 at 37]. In a progress note dated October 13, 2010, Dr. Berg noted that Plaintiff had "not improved to the point of being able to work in any gainful

7

occupation" and that the timeframe for any improvement was "still unclear." [Doc. 15-1 at 36].

During a November 9, 2010 visit, Plaintiff reported decreased anxiety symptoms but still significant pathological doubt. Plaintiff reported continuing to check things "but not excessively." [Doc. 15-1 at 35]. During a November 29, 2010 visit, Plaintiff reported feeling less anxious but still suffering from insomnia. He further reported that he was afraid of working with dangerous machinery and fearful of making a mistake. He continued to report poor motivation and energy and slow thinking. [Id.].

### D. Independent Peer Reviews

#### 1. Dr. Knudson Review

At the request of Prudential, Dr. Dean Knudson, a board certified psychiatrist, conducted a psychiatric review of Plaintiff's file. [Doc. 15-1 at 50-64]. As part of his review, on November 4, 2010, Dr. Knudson spoke to Ms. McClung. [Doc. 15-1 at 47]. During that conversation, Ms. McClung opined that: Plaintiff had not had difficulty with overt symptoms of mania or psychosis; had not had a psychiatric hospitalization; had been a motivated and compliant participant in individual psychotherapy every seven days; appeared to be taking psychiatric medications of which Ms. McClung was unaware (sic); had not had significant complicating or co-existing somatic

8

or physiologic conditions; had not had difficulty with drug or alcohol abuse or dependence; had some degree of difficulty with a supervisor over the volume of work he had been expected to perform; and had spent his time away from work working on projects around the house, which he had difficulty finishing. [Id.]. Ms. McClung suggested that the Plaintiff could conceivably return to work in "six months." [Id.].

In his November 12, 2010 report to Prudential, Dr. Knudson found that the total body of evidence submitted for review did not provide credible, objective and contemporaneous description of an impairing psychiatric disorder as of August 1, 2010, and on an ongoing basis. [Doc. 15-1 at 50-56]. Dr. Knudson noted that the record did not include comprehensive mental status examinations; detailed psychological testing; appropriately conducted and selected standardized rating scales; appropriate and evidence-based global assessment of functioning rating scales; or credible, independent and adequately documented observations from third parties describing mental health symptoms that would support impairment from August 1, 2010, forward. [Id.]. In support of his opinion, Dr. Knudson noted that recent progress notes did not describe a clinical picture of severe and sustained depressed mood associated with prominent, prolonged, and impairing vegetative depressive symptoms such

9

as sustained anhedonia, inappropriate guilt, sustained feelings of decreased self-esteem, sustained and serious impairment of concentration, significant and prolonged daily insomnia, sustained loss of appetite, or thoughts of suicide. [Doc. 15-1 at 55]. Dr. Knudson also noted that the Plaintiff was functioning around his home. [Id.]. Dr. Knudson pointed out that it was not clear if the Plaintiff simply has an obsessive personality style, which in and of itself, would not provide justification for restrictions, limitations or a status of a psychiatric impairment. [Id.]. Dr. Knudson found that the record reflected neither a description of overt symptoms of mania or psychosis nor a description of an anticipated need for inpatient psychiatric hospitalization and he did not find a pattern of frequent and aggressive manipulation of psychiatric medications as a response to sustained symptoms. [Id.]. Dr. Knudson also noted that he found no documentation or reports of significant complicating somatic or physiologic conditions and no description of drug or alcohol abuse or dependence. [Id.]. Dr. Knudson noted that there was a suggestion of possible conflict in the workplace in that the Plaintiff had expressed concerns about the volume of work that he was asked to do. [Id.].

Dr. Knudson noted that it was unclear if the Plaintiff simply has a longstanding personality style that makes it difficult for him to function

within his chosen profession. [Doc. 15-1 at 53-54]. He also noted that it is unclear to what extent stressors at home, such as caring for his grandchildren, complicate the Plaintiff's conditions. [Doc. 15-1 at 54]. Moreover, due to the discussion about a potential plumbing business and Plaintiff's desire not to return to his former employer, Dr. Knudson found it unclear to what extent the Plaintiff's lack of desire to return to work complicated his return to work and influenced his decision to remain away from work. [Id.]. Since he was unable to find any evidence of functional impairment, Dr. Knudson concluded that there were no temporary or permanent restrictions and limitations that were supported as of August 1, 2010, forward. [Doc. 15-1 at 55]. Dr. Knudson found that if the Plaintiff's obsessive-compulsive traits are related to a longstanding personality style, his personality style may not necessarily be amenable to significant change through psychotherapy or medication management, and he simply may be poorly suited to his chosen career. [Doc. 15-1 at 56]. Dr. Knudson stated that it was difficult to determine whether optimal treatment had been given. [Id.].

## 2.    Dr. Stelnman Review

On January 3, 2011, Dr. David Stelnman, a board certified psychiatrist and neurologist, reviewed the Plaintiff's file.  [Doc. 15-1 at 18-31].  Dr. Stelnman reviewed all the medical records in the file and related a conversation that he had with Dr. Berg.  [Doc. 15-1 at 19].  According to this conversation, Dr. Berg started treating the Plaintiff in the summer of 2010, for depression and obsessive compulsive symptoms.  [Id.].  Dr. Berg indicated, however, that she had not seen the Plaintiff since his appointment in November 2010.  [Id.].  Nonetheless, Dr. Berg reported that the Plaintiff "does not want to go back to work at this time" and though he had thought about working for himself, he "does not even feel like doing that."  [Id.].  Dr. Berg also informed Dr. Stelnman that the Plaintiff suffers from obsessive compulsive symptoms.  [Id.].  Dr. Stelnman reported that Dr. Berg found the diagnosis of OCPD to be unclear.  [Id.].  Dr. Berg noted that she reached the diagnosis of OCD because of Plaintiff's "pathological doubt, obsessing about tasks, but that he had no compulsions and he did no checking as part of his disorder."  [Id.].  Dr. Berg also noted that the Plaintiff's concerns about a purported inability to perform a job involving the use of machinery were only self-reported.[3]  [Id.].

_____

[3] There is no indication that Dr. Berg herself found that the Plaintiff is unable to perform

After reviewing the evidence in the file and following his conversation with Dr. Berg, Dr. Stelnman concluded that the file does not contain evidence of psychiatric or cognitive impairment. [Doc. 15-1 at 28]. Dr. Stelnman determined that the Plaintiff's purported inability to work was based only on his self-reporting. [Id.]. Dr. Stelnman pointed to the fact that Dr. Berg cited only the Plaintiff's subjective complaints, and reported that the Plaintiff complained that he was depressed and had chosen not to return to his previous line of work. [Id.]. Dr. Stelnman noted that Dr. Berg never indicated any mental status change, findings or functional findings in terms of the Plaintiff's functional abilities. [Doc. 15-1 at 29]. Additionally, Dr. Stelnman noted that the record did not reflect functional difficulties and that the Plaintiff's doctors and therapists had relied 100% on the Plaintiff's report of his situation. [Id.]. Dr. Stelnman further noted that there were no observable psychiatric disabilities of any kind during treatment. [Id.]. Dr. Stelnman also noted that when the Plaintiff's mental status was examined, the results were generally normal and that, in spite of some reported memory and cognitive difficulties, no clinician had seen the need to evaluate these further. [Id.]. According to Dr. Stelnman, though the Plaintiff's doctors and counselor had rightly concluded that the Plaintiff

a job involving machinery independent of the Plaintiff's own self-report of an inability to do so.

13

needs treatment for his subjective complaints, at no time had anyone ever observed any functional limitations or disabilities. [Id.].

Though the Plaintiff's records reference diagnoses of Major Depressive Disorder, OCPD, and OCD, Dr. Stelnman did not see any observations that would warrant a diagnosis of OCD as Dr. Daly diagnosed, that Dr. Berg had found the Plaintiff's diagnosis of OCPD to be unclear. [Id.]. In any event, Dr. Stelnman concluded that it is extremely unlikely that either of these two disorders began around the time of the Plaintiff's disability in 2010. [Id.]. Dr. Stelnman then noted that these are fairly chronic disorders and generally unremitting, and there is evidence that Plaintiff has suffered from them before, but that they appear less severe than in the past. [Id.]. Therefore, Dr. Stelnman concluded that there is no documentation suggesting that the Plaintiff's recurrent major depression or the obsessive compulsive spectrum disorder had recently worsened. [Id.]. Dr. Stelnman further found no evidence of side effects of the Plaintiff's medications from August 1, 2010 forward. [Doc. 15-1 at 29-30].

When asked whether optimal treatment had been rendered, Dr. Stelnman noted that Dr. Berg had reported that the Plaintiff was doing reasonably well on his treatment and had benefited from it. [Doc. 15-1 at

14

30].   Accordingly, Dr. Stelnman opined that the Plaintiff was receiving appropriate treatment.   [Id.].   Dr. Stelnman questioned why, however, if Plaintiff and his psychiatrist were satisfied with his current treatment, they would conclude that there was no opportunity for additional improvement. [Id.].   Dr. Stelnman further noted that, although both Ms. McClung and Dr. Berg deemed the Plaintiff permanently disabled, their records and the manner in which they treated Plaintiff indicated that a belief that he has a fairly chronic disorder which has been modestly benefited in the past by medication and continues to be benefited by the same medication.   [Id.]. Therefore, Dr. Stelnman found no correlation between Plaintiff's treatment and any functional limitations or disabilities.   [Id.].

###   E.   Internal Medical Review

On   August   27,   2010,   Jon   Vigneault,   RN,   conducted   his   first capacity/clinical review of the Plaintiff's medical records.   [Doc. 15-3 at 31-35].   He concluded that the Plaintiff had experienced bouts of significant depression that historically have a seasonal component.   [Doc. 15-3 at 35]. He also noted that it appears that the Plaintiff's depressive symptoms, combined with his obsessive compulsive tendencies, may have caused problems at work.   [Id.]. Nonetheless, Nurse Vigneault found that since the Plaintiff had been prescribed psychotropic medications and had begun

15

seeing both a psychiatrist and a therapist, there was an improvement in the Plaintiff's overall functional status and discussion of future work potential (i.e., the plumbing business). [Id.]. In an effort to ensure that he was providing a comprehensive assessment, however, Nurse Vigneault indicated that he would phone Plaintiff's therapist for additional insight. [Id.].

On September 17, 2010, Nurse Vigneault re-reviewed the file following receipt of Ms. McClung's Questionnaire of that same date and concluded that based on all of the available data, Plaintiff had at least some level of functional capacity as evidenced by his activity level (i.e., home projects, assisting with friend's sewer system, etc.). [Doc. 15-3 at 28-30]. Nurse Vigneault found the data suggesting a lack of full-time capacity to be somewhat limited and fairly subjective. [Doc. 15-3 at 30]. On September 21, 2010, Nurse Vigneault discussed Plaintiff's case with Dr. John LoCascio, Prudential's Vice President and Medical Director. [Doc. 15-3 at 26]. They concluded that while the Plaintiff may have been psychiatrically impaired during the first few months of his leave from work, by July 2010, the records suggested that Plaintiff continued to regain weight lost earlier, had a positive reaction to anti-depressant medication, and had experienced increased overall activity. [Id.]. Per Nurse Vigneault, the records also

16

indicated that the Plaintiff planned to start his own plumbing business and there was no indication that his providers were discouraging or restricting him from doing so. [Id.]. Thus, while Nurse Vigneault noted the Plaintiff's ongoing symptoms, he determined that the contemporaneous information failed to provide compelling evidence of functional impairments of sufficient intensity and severity so as to preclude the Plaintiff from working. [Id.].

Also on September 21, 2010, Dr. LoCascio conducted a capacity/clinical review of the Plaintiff's file. [Doc. 15-3 at 26-28]. Dr. LoCascio noted that:

> [While Plaintiff's medical records] reasonably support a limited period of psychiatric impairment to the extent that [Plaintiff] could not sustain gainful employment at one point . . . [Plaintiff's] GAF is now improved to the point where he could sustain employment (i.e., -- he is no longer psychiatrically 'limited') . . . .

[Doc. 15-3 at 27]. Thus, Dr. LoCascio concluded that there was no reasonable support for significant psychiatric restriction. [Id.]. Dr. LoCascio determined that, "the current, major obstacle to [Plaintiff's return to work] is that [Plaintiff] is 'burned out' in his prior employment situation and needs an alternative." [Id.]. As Dr. LoCascio noted, however, this is "a common, *non-medical/non-psychiatric situation* in the lives of most if not all normal people." [Id. (emphasis added)].

17

## IV. DISCUSSION

### A. Standard of Review

#### 1. The Summary Judgment Standard

The parties have submitted cross-motions for summary judgment, wherein each side contends that there are no issues for trial and that judgment may be rendered as a matter of law based upon the administrative record. Upon review of the administrative record, the Court determines that the facts are adequately presented therein, and that no genuine dispute as to any material fact exists. Accordingly, summary judgment is an appropriate means by which to resolve the issues presented.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003). If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist. Id.

18

A party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. Furthermore, neither unsupported speculation, nor evidence that is merely colorable or not significantly probative, will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that reasonable minds could differ on a material point, then, regardless of any proof or evidentiary requirements imposed by the substantive law, summary judgment, if appropriate, shall be entered.

Id. (internal quotation marks and citations omitted).

In considering the facts for the purposes of a summary judgment motion, the Court must view the pleadings and materials presented in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor. Adams v. Trustees of the Univ. of N.C.-Wilmington, 640 F.3d 550, 556 (4th Cir. 2011). Where both parties seek summary judgment, the Court "must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citation omitted).

## 2.    Applicable ERISA Standard of Review

The decision of an ERISA plan administrator is reviewed *de novo* "unless the benefit plans gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).  If the benefit plan grants such discretionary authority, a reviewing court may overturn the decision of the administrator or fiduciary only if that court determines that the administrator abused that discretion.  Id. at 111, 109 S.Ct. 948; Feder v. Paul Revere Life Ins. Co., 228 F.3d 518, 522 (4th Cir. 2000).

The parties do not agree as to the appropriate standard of review to be applied in this case.  Plaintiff argues that the STD and LTD Plans do not confer any discretionary authority on the plan administrator and therefore *de novo* review is appropriate to the denial of coverage at issue.  [Doc. 21 at 3-6].  Defendants contend, on the other hand, that the Plans confer discretionary authority on the administrator and therefore a more deferential standard of review is appropriate.  [Doc. 24 at 17-19].

The STD Plan provides that a participant's benefits will terminate by no later than the date on which the participant "fail[s] to submit satisfactory proof of continuing disability."  [Doc. 15-4 at 95].  Similarly, the LTD Plan

20

contains language which provides that a participant is no longer entitled to benefits on the date when the participant fails to submit proof of disability "satisfactory to Prudential." [Doc. 15-4 at 42]. Plan language which requires a plan participant to submit "satisfactory proof" of a disability does not grant an administrator discretionary authority. Gallagher v. Reliance Std. Life Ins. Co., 305 F.3d 264, 269 (4th Cir. 2002). Moreover, while the SPD states that Prudential "has the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits" [Doc. 15-4 at 63], the SPD is not part of the Plan and therefore cannot grant discretionary authority to the administrator. [See Doc. 15-4 at 61 ("The Summary Plan Description is not part of the Group Insurance Certificate.")]. See CIGNA Corp. v. Amara, __ U.S. __, 131 S.Ct. 1866, 1878, 179 L.Ed.2d 843 (2011) (noting that "summary documents, important as they are, provide communication with beneficiaries about the plan, but ... their statements do not themselves constitute the terms of the plan"); Shoop v. Life Ins. Co. of N. Am., 839 F.Supp.2d 830, 837 (E.D. Va. 2011) ("even though the SPD states that [the administrator] has sole discretion to interpret the terms of the Policy, the fact that this language is not included in the Policy itself, means [the administrator's] interpretation of the Policy terms is due no deference"). Accordingly, the Court holds that the

21

appropriate standard of review of Prudential's denial of Plaintiff's claim for benefits is *de novo* and the Court must next determine whether the proof of disability submitted by the Plaintiff was objectively satisfactory. See Gallagher, 305 F.3d at 270; Shoop, 839 F.Supp.2d at 836.

### B.   Disability Determination

Plaintiff's primary argument is that Prudential's decision to deny him benefits was based on misleading medical reviews and a selective review of the evidence.  For the reasons set forth below, the Court rejects this argument.  Prudential rejected Plaintiff's disability claim because Plaintiff failed to provide objective medical evidence documenting the severity of his medical conditions and resulting functional limitations.  After a careful *de novo* review of the entire administrative record, the Court concludes that Prudential properly denied Plaintiff's claim for benefits.

Under the Plans, the Plaintiff was eligible for STD and LTD benefits only if he was unable to perform the material and substantial duties of his regular occupation.  [Doc. 15-4 at 31; 15-4 at 89].  Plaintiff, however, failed to provide objective medical evidence to support such a finding.  The only evidence that Plaintiff provided to show that he cannot actually perform the functions of his job are his self-reports to treatment providers of his inability to concentrate, anxiousness, depressed feelings, and fatigue.   Plaintiff

22

failed to produce any evidence, beyond his own subjective complaints, to establish that he had any performance problems while working due to psychiatric conditions.

Though the LTD Plan allows for the payment of limited benefits based on "self-reported symptoms," objective medical evidence is still required to establish an impairment and resulting loss of functionality. "Were an opposite rule to apply, LTD benefits would be payable to any participant with subjective and effervescent symptomology simply because the symptoms were first passed through the intermediate step of self-reporting to a medical professional." Coffman v. Metro. Life Ins. Co., 217 F.Supp.2d 715, 732 (S.D.W. Va. 2002). If that were the case, plan administrators would be greatly hindered in the exercise of "their fiduciary role of carefully scrutinizing self-reporting, preventing malingering, and consequently guarding the assets of the trust from improper claims, as well as paying legitimate claims." Id. (quoting Brogan v. Holland, 105 F.3d 158, 164 (4th Cir. 1997)) (internal quotation marks and alterations omitted).

While Plaintiff's doctors and therapist have opined that he is incapable of working, their treatment records do not reflect the use of any objective criteria, such as comprehensive mental status evaluations, detailed psychological testing, or other appropriately conducted

23

standardized tests, to assess Plaintiff's mental conditions or any resulting functional limitations.  Rather, Plaintiff simply reported to his physicians that he was having problems and did not think that he could work.  Because Plaintiff failed to submit any objective evidence demonstrating any impairing functional limitations resulting from his psychiatric conditions, Prudential properly concluded that the medical evidence of record does not support a finding that Plaintiff is precluded from performing the material and substantial duties of his regular occupation due to psychiatric symptoms. See Gallagher, 305 F.3d at 376 (affirming denial of claim which was unsupported by objective medical evidence).

Plaintiff contends that Prudential failed to provide him adequate notice in writing of the specific reasons for the denial of his claim, in contravention of 29 U.S.C. § 1133(1).  [Doc. 25 at 5].  Under ERISA § 413(1), an employee benefit plan is required to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant . . . ."  29 U.S.C. § 1133(1).  ERISA regulations further provide that the notice of denial must contain:  (1) the specific reason or reasons for the denial; (2) reference to the specific plan provisions on which the determination is

24

based; (3) a description of any additional material or information necessary for the participant to perfect his or her claim and an explanation of why such material or information is necessary; and (4) a description of the plan's review procedures. 29 C.F.R. § 2560.503-1(g)(i)-(iv). The Fourth Circuit has held that "substantial compliance with the spirit of the regulation will suffice, for '[n]ot all procedural defects will invalidate a plan administrator's decision." Ellis v. Metro. Life Ins. Co., 126 F.3d 228, 235 (4th Cir. 1997) (quoting Brogan v. Holland, 105 F.3d 158, 165 (4th Cir. 1997)), abrogated on other grounds by Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 128 S.C.t 2343, 171 L.Ed.2d 299 (2008). "Substantial compliance" is found "where the claimant is provided with 'a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review.'" Ellis, 126 F.3d at 235 (quoting Brogan, 105 F.3d at 165).

Contrary to Plaintiff's arguments, a review of Prudential's denial letters reveals that the Plaintiff was provided with a number of "specific reasons" which were "written in manner calculated to be understood by [Plaintiff]." 29 U.S.C. § 1133(1). For example, in its first denial letter, Prudential informed Plaintiff that a review of his records indicated that "[w]hile ongoing symptoms are noted, the medical documentation fails to

provide evidence of a functional impairment of sufficient intensity and severity as to preclude [Plaintiff] from working." [Doc. 15-3 at 79]. Prudential also quoted the specific language of the LTD Plan, which informed Plaintiff that he is only entitled to disability benefits "when Prudential determines that [he] is unable to perform the material and substantial duties of his regular occupation due to [his] sickness or injury," and informed Plaintiff that it had determined that he "did not meet the definition of disability" as defined in the letter. [Doc. 15-3 at 79-80]. Prudential then provided Plaintiff with information on how to appeal his claim and informed him that his "appeal should contain ... [m]edical evidence or information to support [his] position such as: copies of therapy treatment notes[, a]ny additional treatment records from physicians[, and a]ctual test results." [Doc. 15-3 at 81]. This information substantially complies with ERISA's notice requirements. See Ellis, 126 F.3d at 235. Prudential was not required to include anything additional in its denial letter to instruct the Plaintiff on what he needed to provide in order to obtain disability benefits. Havens v. Metro. Life Ins. Co., No. 1:05-1136, 2006 WL 2371117, at *5-6 (S.D.W. Va. Aug. 14, 2006) (concluding that plan administrator had no obligation to advise claimant of the specific type of

objective medical evidence he needed to provide in order to obtain benefits).

The specific reasons cited in Prudential's first appeal denial letter were not, as contended by Plaintiff, "completely novel." [See Doc. 25 at 9]. The cited deficiencies simply restated Prudential's prior finding that "[w]hile ongoing symptoms are noted, the medical documentation fails to provide evidence of a functional impairment of sufficient intensity and severity as to preclude [Plaintiff] from working," which was Prudential's "specific reason" cited in its initial denial letter. [Doc. 15-3 at 79]. In other words, the list of "missing evidence" identified in the first appeal letter was merely part of Prudential's overarching argument, as stated in its prior correspondence, that the medical evidence submitted by Plaintiff failed to demonstrate impairment. Prudential consistently put Plaintiff on notice of the type of evidence that would be required to establish disability; yet, Plaintiff never submitted such evidence. Plaintiff's argument that he failed to receive proper notice of the reasons for the denial of his claims is simply without merit.

The Plaintiff also disputes Dr. LoCascio's assertion "that [Plaintiff's] GAF [of 50] is now improved to the point where he could sustain employment." [Doc. 21 at 19]. The Plaintiff cites to a source indicating that

27

a GAF in the range of 41-50 *could* be indicative of serious symptoms or serious impairment.[4]   [Id.].   Significantly, however, the record fails to indicate the manner in which Dr. Berg derived her GAF score.  Moreover, Dr. Berg's own findings call this GAF score into question.   Dr. Berg assessed a GAF of 50 despite the fact that in the same examination, she reported that Plaintiff was not experiencing hallucinations or delusions; was neither suicidal nor homicidal; had a logical and coherent thought process; had intact judgment and memory; and had good insight regarding his condition.  [Doc. 15-2 at 23].  Even if there were objective medical evidence to support Dr. Berg's GAF assessment, however, a single GAF score is not conclusive of disability, especially where, as here, the overall objective medical evidence fails to demonstrate a loss of functionality.  See Willis v. Metro. Life Ins. Co., No. 1:04CV00080, 2005 WL 4829601, at *7 (W.D. Va. Apr. 12, 2005) (affirming denial of benefits even though plaintiff was diagnosed with a GAF of 40-45 because "the records submitted to [the insurer] were largely devoid of any objective evidence supporting [plaintiff]'s

---

[4] The GAF scale, which ranges from zero to 100, "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders at 34 (4th ed. 1994) (DSM-IV).  A GAF of 41-50 indicates that the individual has serious symptoms or serious impairments in social, occupational or school functioning.  Id.

claim" and because "all objective findings were within normal limits."); Harley v. Int'l Paper Co. Long Term Disability Plan, 586 F.Supp.2d 428, 439-40 (D.S.C. 2007) (affirming denial of claim, despite plaintiff's GAF score of 50, where "there were no data detailing loss of global functionality"). Therefore, Prudential did not err in relying upon Dr. LoCascio's assessment in determining that Plaintiff was not impaired.

In arguing that Prudential lacked any basis for terminating his STD benefits and denying him LTD benefits, the Plaintiff relies heavily on the fact that Prudential had approved STD benefits for a period of time. [Doc. 21 at 25]. The Plaintiff's argument is misguided. As Prudential's notes make clear, the Plaintiff's STD claim was approved based on Plaintiff's self-reported complaints and a preliminary review of the then-existing medical records. [Doc. 15-3 at 42-43]. The Plaintiff was informed that his claim would be periodically reviewed and that additional medical information may be required to support his continued absence from work. [Doc. 15-3 at 112-13]. Under the terms of the Plans, Prudential was entitled to request updated medical information during the period of disability in order to investigate his claim further. The fact that Prudential initially paid STD benefits, therefore, did not preclude Prudential from later terminating these benefits based on a more complete and updated medical record.

29

In support of his motion for summary judgment, the Plaintiff argues for the first time that Prudential breached duties owed to him by not providing him with workplace modifications, assistance in obtaining Social Security benefits or a rehabilitation plan. [Doc. 25 at 20-21]. Plaintiff made no such claims in his Complaint; as such, these claims are not properly before the Court. Even if such claims had been properly pled, however, the Plaintiff has not provided any support for any of these arguments. Pursuant to the plain terms of the LTD Plan, all of the benefits cited by Plaintiff are benefits that accompany a finding by Prudential that the claimant *is* disabled under the terms of the Plan. [Doc. 15-4 at 47-48]. Thus, in order to be eligible for such benefits, the Plaintiff would have first had to prove that he is unable to perform the material and substantial duties of his regular occupation without modification. [Id.]. Because Prudential properly found that the Plaintiff is not precluded from performing the material and substantial duties of his regular occupation, the Plaintiff was simply not entitled to these benefits.

## V. CONCLUSION

For the reasons set forth above, the Court concludes that Prudential acted appropriately in denying Plaintiff's claims for STD and LTD benefits.

Accordingly, Plaintiff's Motion for Summary Judgment is denied, and Defendants' Motion for Summary Judgment is granted.

**IT IS, THEREFORE, ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 23] is **GRANTED**, and the Plaintiff's Motion for Summary Judgment [Doc. 19] is **DENIED**.

A Judgment consistent with this Memorandum of Decision and Order shall be filed contemporaneously herewith.

**IT IS SO ORDERED.**    Signed: March 29, 2013

Martin Reidinger
United States District Judge

Case 1:11-cv-00090-MR-DLH   Document 30   Filed 03/29/13   Page 31 of 31